1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF OKLAHOMA

3   SINGER OIL COMPANY, LLC, an          )
    Oklahoma Limited Liability          )
4   Company,                            )
                                        )
5                                       )
            Plaintiff,                  )   CASE NO. CIV-16-768-M
6                                       )
    vs.                                 )
7                                       )
                                        )
8   NEWFIELD EXPLORATION                )
    MID-CONTINENT INC., et al.,         )
9                                       )
                                        )
10                                      )
            Defendants.                 )
11                                      )


12                    EXCERPT OF JURY TRIAL

13                    OPENING STATEMENTS

14       BEFORE THE HONORABLE VICKI MILES-LaGRANGE

15             UNITED STATES DISTRICT JUDGE

16                   NOVEMBER 8, 2017

17

18

19

20

21

22

23

24

25  Proceedings recorded by mechanical stenography; transcript
    produced by computer-aided transcription.

| 1 | **<u>APPEARANCES</u>** |

<u>**FOR THE PLAINTIFF:**</u>

STEVEN D. SINGER
Attorney at Law
324 West Maine Street
Enid, Oklahoma  73701

<u>**FOR THE DEFENDANTS:**</u>

GREGORY L. MAHAFFEY
JOHN PAUL ALBERT
BRADY L. SMITH
Mahaffey & Gore
300 NE 1st Street
Oklahoma City, Oklahoma 73104

1    (The proceedings were held November 8, 2017, in open court

2 with all parties and the jury present.)

3    MR. SINGER:  May it please the Court, first I would

4 like to give my sincere and honest thank you for the service that

5 you're about to render.  I think it's pretty clear to you that we

6 have two camps over here that can't seem -- they have got a

7 problem, they can't work it out themselves.  They had to make a

8 public show of it.  And here we are in the public courthouse

9 inviting people, you know, that just got smashed together to try

10 to help us figure it out.

11    There's a certain -- I don't want to get cornball about it.

12 There's a certain magic and majesty of our form of conflict

13 resolution in this country.  It's really, really neat.  And it's

14 a pleasure and my privilege, really, to turn my trouble over to

15 you so that you-all can talk amongst yourselves and figure out

16 what's right, because that's really what this is all about.

17 We're -- we can't figure it out for ourselves.  We have to turn

18 to you-all to help us find out what is the fair thing to do in

19 this problem.

20    Well, you have heard enough, I think, to get a sense as to

21 what our trouble is.  We have got some underground oil and gas

22 drilling going on and we have got some trouble that relates to

23 that underground oil and gas drilling.

24    My man, the man I represent, owns a vertical wellbore that

25 just goes straight down to a certain depth.  It's been drilled.

It's been there for a long time, since the '70s.  It generates
oil and gas every month, not a lot, not a lot, a little bit every
month, month in and month out.  It's been doing it for a long
time, since the '70s.  And our feeling was, but for what happened
to us, it would have kept producing a little bit of oil and a
little bit of gas every day, every month for a long period of
time.  That's our line of work.

What does Newfield do?  Newfield is in the technically
invigorating and exciting field of underground horizontal
fracking.  It's marvelous.  And I don't suppose you'll hear
anything out of my mouth that is against fracking.  This isn't
about the environment.  This case isn't, thank God.  No
pollution, particularly, to speak of.  This case isn't about, oh,
the water being damaged or any -- none of that.

Okay.  This is just a pure example of when Newfield did
their horizontal well, what they do is they go down straight,
just like we do, and instead of our well, back in the '70s, we
just stopped right there and then that's what we're producing.
But the Newfield technology allows them to make a 90-degree turn
and then just take off.  They can go many, many, many, many
yards.  Okay?  And they can steer that underground straw that
they're digging underground, they can make turns, they can decide
where they want to go and they can do what they want.  And it's
really neat because what it allows them to do is snake around
underground and go where the oil is.  Okay?

1     This is America.  That's their business.  No problems until
2 it interferes with us.  So here's what -- here's the controversy.
3 We're minding our own business.  We're producing our fair share
4 of the oil and gas that's underground.  And Newfield comes and
5 instead of being, you know, 600 feet away or 1,000 feet away,
6 they get 207 feet away from us.  Okay?
7     And then they start doing what's called their fracking,
8 which is the process of taking a bunch of water, like literally
9 millions of gallons of water, and a whole bunch of really fine
10 sand, it's really, really fine.  And they mix it all up, and they
11 put some chemicals and stuff in there, and then they pump it
12 underground under huge pressure.  I think it's like 9,000 PSI,
13 heavy pressure.
14     And what happens is the water and the sand goes underground.
15 It's under so much pressure, it actually fractures the rock.  It
16 actually goes underground, it fractures the rock.  And then the
17 sand, those little grains of sand, they stick around and they
18 kind of hold the rock open a little bit, just a little, just
19 enough to let the oil and gas out.  Okay?
20     That's a perfectly fine endeavor, except they did it next to
21 us.  And what ended up happening was all that gunk, all the
22 fluids, the millions of gallons of fluid that they put under, the
23 tons and tons and tons of sand, I think it was
24 one-point-something million pounds of sand right next to us, all
25 that migrate -- under high pressure, it just went over to our

wellbore and messed it up. It's dead now. And that's what this
is about.

We are upset that they broke our toy and we want them to fix
it. We're not trying to change the laws of fracking. We're not
trying to do -- you know, we're just trying to get our well
compensated. Okay?

Now, there are some nuances here. About six months before
the frac took place, Newfield sent a man, a nice man, over to
this guy's office with a contract and said, here, sign this, this
will -- we're going to frac next to you. We're all in the
business, you know, so you're not going to get mad at us. We're
all in the business. We're going to frac next to you and we'll
work with you. We won't get too close, we'll give you plenty of
notice so you can prepare, and if we break anything, we'll work
with you on the money. Okay?

So he signs it and doesn't complain to the Corporation
Commission or anything about anything. He just goes along with
it. Newfield does their frac. They don't give notice. They
don't abide by how far away they're going to be and they sneak in
a little closer.

And when they did their frac, millions of gallons, tons of
sand, it did wreck his well. But they didn't -- obviously, we're
here today. We weren't able to work out the money. Okay?

So there was a contract. There was an effort to try to work
together between the businessmen, not have to involve some jury

1 on our trouble, but it failed.  Okay?

2      Newfield, they're not evil and I'm not trying to suggest

3 that they're bad or anything like that.  They're big.  Okay?  And

4 sometimes a big lumbering giant behaves in a certain way,

5 sometimes a really big, publicly traded company that is used to

6 behaving in a certain way when they deal with a little guy in

7 Kingfisher, okay, or Hennessey --

8           MR. MAHAFFEY:  Objection, Your Honor.

9           THE COURT:  The basis of your objection, Counsel?

10           MR. MAHAFFEY:  May I approach?

11           THE COURT:  Yes.

12      (Bench conference held outside the hearing of the jury.)

13           MR. MAHAFFEY:  Your Honor granted a motion in limine

14 about not referring to financial worth and counsel's going on

15 about the big public lumbering giant.

16           MR. SINGER:  Oh, I'm just trying to explain, Judge, the

17 dynamic, because we do have a big publicly traded company and a

18 small independent.  I'm not getting into the money.  I'm just

19 talking about relative size relative power.  And it's opening

20 statement, Judge.  I'm not -- I mean, I would suggest that I'm

21 not crossing any boundaries.

22           MR. SMITH:  -- motion in limine addressed the company

23 size as long as it was even --

24           MR. SINGER:  Say again.

25           MR. SMITH:  The motion in limine addressed company size

 1  for both, and you objected, assuming the same.  It was both ways,

 2  two-way street.

 3          MR. SINGER:  Right, Judge.  It's not my intention to

 4  breach any of your limine rulings.  It's not a foreign concept

 5  and it's not something these people can't figure out anyway.

 6  I'll move on, if you would like for me to.

 7          THE COURT:  Yeah.  I don't think that was a violation

 8  per se.  I think it could get to be one.

 9          MR. SINGER:  Yes.  And I --

10          THE COURT:  Can you --

11          MR. SINGER:  -- the admonition.

12          THE COURT:  Have you finished?  Can you move on?

13          MR. SINGER:  Yes.

14          It's one lawyer, one objection, right?  I mean, you're

15  not going --

16          THE COURT:  No.  One of you do it, one of you do it.

17      (In open court, in the presence of all parties, counsel, and

18  in the hearing of they jury.)

19          THE COURT:  You're recognized.

20          MR. SINGER:  May it please the Court, I want to jump

21  right back in.

22      And I did forget to mention something.  My name is Singer.

23  I'm from Enid.  The name of this client is Singer Oil Company, so

24  I did want to briefly talk a little bit about that.

25      My uncle, Big Charlie, created this company a long time ago.

He retired, and eventually this young man bought it, and that's really the connection. We're not related, but he is a friend of the family, so to speak. And I'm pleased that he was able to buy my uncle's business, and that's kind of the explanation as to my last name and the name of this company.

I did talk a little bit about Newfield's motivation and I suggested that they weren't -- we weren't trying to claim that they were evil or a dark force in the universe or anything like that. They're just trying to maximize oil and gas production. And they determined that by running that lateral line really close to our Smith well, that was the best way to maximize production. Okay? And that's -- I don't think they'll even deny that that's really the main reason why they did this. Because they really could turn and go someplace and avoid trouble with us, but to maximize production you do basically what they did. And that's okay. It's just we're suggesting, with all due respect, that they should pay for the privilege. If they're going to maximize production and do what they decided they wanted to do and if it did ruin our well, well, then just pay us.

And maybe you might look at our motivation something along the lines of, we have this well, it's our property we bought and paid for it, we own it, we maintain it, leave us alone. Don't -- we're not trying to interfere with your work and what you want to frac and what you want to do, we would just like to peacefully operate our little well in harmony and in peace. But when they

1  come in and they totally wreck it, well, there's no peace and
2  there's no harmony.
3      How does Newfield choose to deal with us?  Well, they have
4  been pretty critical.  They have been pretty critical of this
5  fellow.  First of all, they have said really emphatically that we
6  didn't do enough to fix and repair their mess.  They really
7  wanted us to get into our bank account and start spending our
8  money to go through a big list, I guess, of repairs, and maybe
9  they'll work, maybe they won't work.  But they're very, very
10  critical of us for not spending the tens and tens of thousands of
11  dollars that they think maybe could have been done.
12      We think the evidence shows that when we asked them to do
13  it, back when it was all happening, hey, fix our well.  Oh, no,
14  no, we're not -- we're not touching that.  We're not sure how to
15  fix that well.  Things like that.  But they're very critical of
16  us for not cleaning up their mess.  Okay?
17      The other thing is they're calling us opportunists.  They
18  think that we're taking advantage of a situation.  They think the
19  fact that we sued, okay, instead of just sort of take our
20  medicine, you might say, shows that our heart is not pure and
21  that we're out for the bad purpose.  And I believe it's not -- I
22  know it's going to happen, they're going to say straight up that
23  we're greedy, that we're asking for too much money, that you're
24  acting too offended and that you should take a much lesser amount
25  than what it is that we're thinking that the well is worth.  And

1   that's really what this is about.

2        They're going to have economists or people come in and value

3   the well really low.  Okay?  And they'll have their reasons and

4   I'll get up and we'll talk about it and I'll cross-examine them

5   and you'll hopefully get the facts that you need.

6        We have got our own experts and we value the well quite a

7   bit higher.  And here's why:  There's two unique things about

8   this wacky oil well in Kingfisher County.  In Kingfisher

9   County -- maybe you-all -- we're all Okies, you drive around and

10  out in the country you'll see an oil well over there and a pump

11  jack pumping just out by itself in the middle of nowhere.  It

12  turns out that in Kingfisher County the geology is such that you

13  really can drill a well, back in the '70s, and as long as you

14  maintain it and keep it -- you know, keep it greased and

15  lubricated and all the other things that have to be done, it just

16  goes, it just pumps, it just produces.  Okay?

17       And what our people are telling us is that if you have a

18  special well like that, that just goes on and on and on and it

19  never quits, if you start looking at those time horizons, that

20  money starts to add up.  So this well, it may make -- I think it

21  makes a barrel and a quarter of oil a day.  And at 50 bucks a

22  barrel, you know, do the math.  It -- did in and day out, I think

23  it made 30 million cubic feet of gas every day.  And, you know,

24  gas sells for two or three bucks, whatever, do the math.  Every

25  day, day in and day out.

And our guys started looking at those numbers and going, well, this well really is worth something, because it just will produce and produce and produce.  There's not really a short time horizon, it could go produce for 30 years like this.

So instead of some small number, we're finding ourselves looking at numbers like 359,000.  That's one of our -- the expert was looking at all this and said, you know, this could be worth 359,000.  That's one of our numbers.

Mr. Schuppan has a longer time horizon than the expert.  He looks at it a little bit differently, but he can make arguments that it's worth a lot more than that, you know, maybe double that, depending on how you look at the numbers.

Now, the thing that we think is most central to this problem -- because so far I'm just explaining, you know, some businessmen that can't get along and they're fighting over how much is this piece of property worth.  To me, the wildcard about this, the thing that makes it difficult and, if you will, sort of interesting, is what was motivating these people going in.

Newfield had a job to do.  They wanted to maximize production.  They wanted to drive their underground lateral where they wanted to do it.  And they did what they wanted.  Okay?  There was no, may I have permission, is it okay.  No.  They just did what they wanted and that's -- I guess okay.  But this fellow is not a willing seller.  He didn't say, oh, my Smith well -- that's the name of this well, the Smith -- my Smith well is for

sale and he put it on Craigslist or however those guys do stuff like that, and trying to, you know, entice somebody to buy it. This well was never for sale. This well he was going to keep for as long as he could, because it just kept producing oil and it kept producing gas real steady-like.

For him to ask for a higher number because they essentially came and took it away from him is one of the core concepts in this case. It's one of the most difficult aspects of it, because there's not ever going to be a circumstance where he wanted to do this. He just wanted to be left alone. But when they came and they wrecked his well, okay, he ain't getting rid of it for cheap. Okay? That's why we're here talking to you.

It's not necessarily something that we're bashful about, asking for real money. We're not asking for false money. We're not asking for fanciful or speculative money. We just think we can prove more than they have -- are willing to pay. And since they're not willing to do it, I have to convince you-all, because you can make it happen. You can make me take a pittance, you can make them pay a higher number, because you-all have the power to figure this out.

In addition to the value of the well that we're going after, we're upset with them for some other stuff that they have done. We don't like how they broke the contract with us. We don't like that. They didn't give us notice. They came in closer than they said they were going to do, so we have got a breach of contract

claim.

One of the facts that you'll hear is that this guy's -- has other wells that are just like this in the neighborhood. Newfield is really active, really active in Kingfisher. And there's an element of this being kind of a nuisance for a guy just trying to mind his own business and run his own little company. If you have got a big company like Newfield doing fracs, it can be a real problem. And so the law, we call it nuisance. So we have a claim for that.

We have a claim for the subsurface trespass as the water and the sand is being injected under all that pressure underground so close to our wellhead. We're saying that that movement of fluid and sand and such was a form of trespass. And, frankly, we're going to be asking for a little something for that.

What this boils down to, folks, is two, I guess you could say business entities that just simply -- they got a problem. I don't really think that Newfield is really going to strongly suggest that they didn't create this trouble. I just know where the battle is is going to be over money, and that you're going to be submitted and presented with a two -- basically two options. You know, the dirt cheap, this is the -- probably the cheapest that they could with a straight face say this guy's out of, and ours, which we hope is not greedy, not crazy, it's just thoughtful. And that we're really trying to prove the reality of our loss, not make stuff up, but give you something that --

that's real that you can sort of wrap your hands around.

That, ladies and gentlemen, is it in a nutshell.  We do thank you for your help.  And I do want to make one promise -- or I'll really going to try.  I'm going to try to just make my points and move on.  I'm really going to try not to make them ten times, you know, did you get that, did you -- you guys are smart, and I'm really going to try.

I'm not -- I'm really going to try not to waste your time. I'm going to be on time.  I'm going to try to get my points out and get it over with and sit down and shut up so that, you know, the -- you guys can do your part.  I appreciate your help and I look forward to working with you on this.  It's an interesting case.

THE COURT:  Thank you, Counsel.

Mr. Mahaffey, you're recognized for your opening statement.

MR. MAHAFFEY:  Thank you, Your Honor.

Your Honor, ladies and gentlemen of the jury, I would like to give you my thanks for being here also, not that you had much choice.  But we -- we do have an issue that needs to be resolved. And before I start, there's one other party I didn't introduce earlier, Judge, and with your permission --

THE COURT:  You may.

MR. MAHAFFEY:  Mr. Daniel Schoonover.  He's our IT guy. This is a new world for me.  I tried cases for 25 or 30 years with just paper and not all the electronics.  So he's hopefully

1　going to help me out on the electronic end.  I have to have one

2　of my children teach me to do that.

3　　　　The American rule of law, I will concur with Mr. Singer on

4　that, it lets us settle disputes here, in a civilized way, not

5　out on the -- a main street with a, you know, pistol like we see

6　in the movies.

7　　　　And these parties do have a dispute.  For reasons that we're

8　going to get into, we don't think we should be in this courtroom.

9　And I know that you know enough to know that anyone that has a

10　few hundred dollars for a filing fee can hire a lawyer, can bring

11　a suit.  That doesn't necessarily mean it's meritorious.

12　　　　And I like to think of the analogy, what you're going to see

13　here, maybe it's like going to a movie.  This is the chance for

14　me and Mr. Singer to tell you what we think you're going to see.

15　We're kind of the critics, here's what we think you're going to

16　see in the movie.  You're going to watch it and see it from the

17　stand up here, what the witnesses have to say and the evidence.

18　And at the end, the judge is going to give us one more shot to

19　tell you what we think you saw and see if you agree.

20　　　　And what I will tell you, I will not make any representation

21　to you, either now or at the end, that doesn't come from the

22　witness stand.  And I have confidence in you that you will reach

23　a just -- a verdict.

24　　　　Newfield is a publicly traded company.  They're currently

25　based in Houston.  And they -- for many years they had their

1   principal exploration office in Tulsa, and about a year and a

2   half ago ended up consolidating that with their Houston

3   operation.

4       They are one of the more active oil and gas operators in

5   Oklahoma.  Actually, you're going to hear they're one of the

6   leaders in developing the horizontal drilling technology and the

7   fracture stimulation technology that has opened up -- made

8   Oklahoma a significant state again in the oil and gas business,

9   and, in fact, the country.  It's allowed the U.S. to be

10  competitive again with Saudi Arabia and the Middle East on our

11  oil.

12      And they were the leader in developing what's called the

13  Meramec shale.  You're going to be hearing about the Meramec

14  shale and the Mississippian.  Now, if you're like me, when I

15  first heard Mississippian, it's a river.  It's the name of a

16  state.  But it's also what the geologists have called a

17  particular formation that underlies most of Oklahoma, frankly,

18  that was created millions of years ago.

19      We're going to have a sample.  This is a sample of Meramec

20  rock.  And some people think oil and gas maybe is in a pool or

21  something like that, but this is a very tight rock shale.

22      And the -- the area that's being developed out here called

23  the STACK, and that's an acronym for the Sooner Trend Anadarko

24  Basin in the Canadian and Kingfisher County.  You may have seen

25  that name "STACK" show up in the news.  It contains this Meramec

that's a couple hundred feet thick.

And geologists have known for years there's a lot of oil and gas in this, but it was so tight, has -- I mean, you'll get to handle this, it's such small pore space and what they call permeability, it won't flow -- that they couldn't economically recover.  And fortunately, these sediments, though, we have developed this drilling -- horizontal drilling technology to develop it and economically recover the oil and gas.

Now, the fracture stimulation technology allows the oil companies to put these -- the small cracks in the rock.  And the sand, you're going to hear is kind of like beach sand, it holds the little cracks -- these are microscopic cracks open, and does let the oil and gas flow.

Vertical drilling has tried this technique, but vertical drilling, if you think about it, if you drill a vertical well, you're only exposing, if it's 250 feet thick, you're exposing 200 feet to this -- roughly it's a 7-inch hole in the ground, like a doughnut hole.  If you can do these horizontal laterals -- and here, the one you're going to hear about, the Edgar well, was drilled about 8,000 feet down, but then drilled 10,000 feet, 2 miles underground on a horizontal basis, you're exposing a lot more of the rock, that tight rock to the wellbore, and that's what allows more production.

Now, I know most of you have driven in western Oklahoma. You have probably seen drilling rigs stacked up, but you're not

1   in the oil and gas business, that's not your interest, you're not

2   -- know about it.

3        So we have a short video that I'm going to ask

4   Mr. Schoonover to put up here that will show you a little bit

5   about the fracture stimulation and kind of what the typical

6   operation is.  And I think it will be important in you evaluating

7   his claims that we somehow permanently damaged his Smith well.

8        So if we could have that short video.  Oh, excuse me, I have

9   got it -- I'm not doing my part, am I?

10       (Video was played.)

11       MR. MAHAFFEY:  Thank you, Daniel.

12       Newfield drilled its Edgar well, much like you saw in the

13  video there, that's about 2 miles east of Kingfisher.  Their well

14  site is about a mile south of Highway 33, about 2 miles east of

15  Kingfisher.  Singer Oil, their Smith 1-18 is about 2 miles east

16  of Kingfisher -- the town of Kingfisher, a mile north of Highway

17  33.  And they commenced that well in the fall of 2015, after they

18  obtained all the regulatory authority required from the Oklahoma

19  Corporation Commission.

20       You're going to hear that the Oklahoma Corporation

21  Commission regulates the oil and gas business in Oklahoma.

22  You're going to hear Mr. Brad Ice, I think, testify, who's the

23  district manager for the Kingfisher district.  And I anticipate

24  he's going to say that Newfield complied with all the

25  requirements of the Corporation Commission to drill and complete

1 and fracture stimulate this well.

2     Around December 1st of 2015, they began fracking the well

3 out in the toe.  The toe is up in the northwest corner of

4 Section 18, not too far from the -- Mr. Singer's well.  And on or

5 about December 5 is when Singer contends that during the fracking

6 job that we have communicated or impacted his well.

7     Now, you're going to hear a lot of things that are in

8 dispute, some different expert witnesses that are going to have

9 issues.  But let me tell you some things that aren't in dispute

10 you're going to hear.  The Smith well, their well, was drilled in

11 1977, 40 years ago, September 1977.  It's been producing for 40

12 years.  It produces in four different formations, not only this

13 Mississippi, but three uphole formations.

14     You're going to hear that it's changed hands a number of

15 times.  And this is common in the oil and gas business, people

16 buy and sell oil wells just like you and I might buy and sell

17 cars or lawn mowers or something like that.  And you're going to

18 hear that Singer is the fifth owner, the fifth operator.  He

19 bought it 11 months before we allegedly totaled -- counsel talked

20 about the wreck.  Well, I'll talk about that too.  Before we

21 totaled his 1977 car.

22     And what you're going to hear, you're going to hear a lot of

23 different numbers and they threw out a number, 359,000.  And he

24 said, well, my client thinks this had some special value to him,

25 owning this well, one of 100 wells he owns for 11 months.  He's

going to put a value, you're going to hear, of $650,000.  What
will not be in dispute, though, he paid $61,000 for the well,
$61,000 ten months before we allegedly destroyed his well.  He
produced it for 11 months.

     And you're going to hear that all oil wells decline.
They're a depleting thing.  You have a limited reservoir of oil
and gas, and as you produce it -- and what's not in this dispute
is this well had produced at least 80 to 85 percent of its
ultimate production already in the last 40 years.  It produced
800 million -- and counsel said it was producing 30 million a
day, I think he made a mistake, he meant to tell you it was
producing 30 MCF a day, which we think is more -- which is
30,000 cubic feet of gas, not 30 million cubic feet of gas.

     But anyway, much like you and I might sell things, people
sell these cars.  And what you're going to hear Mr. Schuppan
testify to at some point is he valued this well the way most
people in the industry do.  He looked at -- when he bought the
well -- it was a package of 11 wells.  He bought 11 wells from a
company called Gastar.  You're going to hear that.  He paid
$220,000 for 11 wells, but he said this one well was worth 61,000
-- actually, he uses two different numbers.  At one point he
said 61, one he said 50,000, but somewhere in that ballpark is
what he paid for it.

     He's going to tell you that the customary way to value a
well is to look at four years of cash flow, 48 months of cash

flow. And that's what he did. His expert's going to say that too, that normally that's how he would evaluate it, but he did something different here. That's not how he did this case, but that's one way to value it.

He's also going to tell you that at such time you plug these wells, you're going to spend 25 to $45,000 to plug the well and to clean up the well. So you might ask, well, why would someone go buy a 40-year-old well that's -- where a larger operator like Gastar is selling it because they -- may not be economic to them. A lot of the operators want to get out from under that burden of plugging the abandoned well, spending the money to go out and clean up the well site and plug the well, and a smaller operator may have lower overhead. I mean, he could maybe get a little more oil and gas out of it than the larger operator.

But this well -- what will not be in dispute, this well has produced about 27,000 barrels of oil to date and 800,000 MCF of gas to date. And Mr. Singer sold about another 300 barrels -- produced and sold, and another 10,000 MCF of gas during the 11 months he operated the well.

On the -- we're going to get into an issue, though, over what this well is actually capable of producing. You heard counsel say, well, it will make a barrel and a quarter a day and 30 MCF a day.

What you're going to see, though, for the last 45 days, and I anticipate our consultant engineer, Mr. Reineke, will tell you

that if you really want to know what a well's doing, if it's producing at capacity, look at what's it's done recently, the most recent 45 days.  The well was only making about 20 MCF a day and less than a barrel of oil per day.

Prices -- at the time that Singer paid $61,000 for this well, you're going to hear the price of oil was around $60 a barrel and gas prices were around $4 per MCF.  Those prices, unfortunately, were about half of that in December of 2015 when we allegedly damaged the well.  Oil prices had dropped to the $33-per-barrel range and $2 per MCF for gas.

You're going to find out he doesn't own 100 percent of this well, he owns about 96, 97 percent, has partners for 3 percent. There's royalty owners, mineral owners that are entitled to a 22 percent royalty.  The State of Oklahoma gets 7 percent tax. So at the end of the day, for every hundred dollars that that well would generate, Mr. -- Singer Oil would get about 73 cents on that dollar -- or I used a hundred dollars, $73 for every hundred dollars.

You're going to find out that his actual cost to operate this well for 11 months was out of pocket $6,866.  If you convert that to the 334 days he operated the well before he claims that we totaled it, that's $20 a day.  If you look at what that -- the prices were in December of 2015 of that -- of what he was netting on the well for the production it was doing at 20 MCF a day and less than a barrel, it works out about $51 a day for his share.

1    Now, what he's also going to tell you is he's charging his
2   partners overhead.  He says there $1,466 a month overhead.
3   That's $47 a day overhead.  He's going to say, I don't charge
4   that to myself, but that's the overhead.  If you add the overhead
5   plus his out-of-pocket expenses of $20, he was actually losing
6   money, or at least his partners were losing money in December
7   of 2015.
8    Now, why do I tell you all that background?  Because, first
9   of all, we don't believe the well is destroyed.  It's going to be
10   our evidence that they made no legitimate effort to repair the
11   well.  If your car doesn't start, you don't total the car.  You
12   take it to the mechanic to see if they can blow out the fuel
13   line, if it has a fuel problem.  Or, you know, plumbing gets
14   stopped up at the house, it's going to be our evidence you don't
15   abandon the house, you get Rotor Rooter out.
16    And our evidence will be that on December the 9th, four days
17   after this alleged damage, they sent a swabbing unit out that
18   spent a total of two hours out there.  Takes about an hour to
19   gear up -- rig up and rig down, so they spent about less -- an
20   hour, plus or minus, swabbing the well and really didn't even
21   swab it totally.
22    They let it sit there for 11 months and they came back to
23   take some water analysis that they wanted samples for this
24   lawsuit, and essentially pumped the water off at that time.  I
25   mean, they could have done that 11 months earlier.  But you're

1   going to hear evidence that the fluid -- but the swabber is going
2   to tell you that he wasn't sent out there to repair the well.  He
3   was just taking some water samples for the well.

4        So our evidence is going to be that for $30,000, or less
5   than that, which -- and if Newfield damaged the well -- here's
6   the problem we have in this case.  No one's going to tell you
7   that they know for sure that we fracked into the well.  No one
8   can see down there.  My client's not going to tell you they
9   didn't, but what they're going to tell you is the indices that
10  you had fracked into the well are not there.

11       Sometimes when wells get impacted or communicated, they'll
12  purge at the surface.  Also, you take a signature.  They did not
13  take analysis of the water when it was allegedly fracked into and
14  have it analyzed to see if it matched the fluid that we were
15  putting in our well.  They waited a year, took water analysis.
16  And you know what you're going to hear, it's fresh water.  It's
17  drinkable water.  It's less than 500 parts per million chloride,
18  which is drinkable -- potable.

19       The evidence is that what this field testing company,
20  Renegade Services, is going to tell you, he expected to see 35 to
21  60,000 parts per million chlorides.  That's kind of the salinity
22  of the Mississippi water is it's like, you know, ocean water,
23  seawater.

24       You're also going to hear that the frac water that Newfield
25  used had about 8,000 parts per million chlorides.  So how did

they get fresh water in their wellbore? It could have a casing
leak, that would -- that's communicating with a fresh water
aquifer, but that's a telltale sign that it's maybe not frac
fluid, it's just water.

Also, our evidence will be that if you take and -- consider
all the costs that Mr. Schuppan had, you look at 11 months that
he was maybe netting around $2,400 a month, and using his basis
for analysis, or even his expert, of looking at four years of
cash flow, if we totaled the well, that's $115,000, not 359, not
$650,000. And you're going to hear that Mr. Singer wants
$650,000 for a well that he paid $61,000 11 months earlier when
prices were higher and -- so anyway, you'll hear that testimony.

If Newfield ran into, bumped into Mr. Singer's 1977 well
with its -- the fracture stimulation job on its Edgar well, we
certainly want to pay for the damage. We -- if we dented it or,
you know, partially harmed it, we want to pay for that, but our
evidence will be that you can -- if the plumbing -- I think
you're going to hear him say that because of the way this well's
plumbed, he can't pull the tubing out. You know, if you're
drinking a milkshake and you -- I like chocolate almond shakes,
but if the nuts get in the straw, you know, I don't throw it out
when I still got 20 or 30 percent left in the bottom. You pull
the straw out and blow it out, you know. And unfortunately, they
can't pull the straw out here, but we're going to say that you
can go up -- what's called a coil tubing unit, you can take that

1   out, you can -- you go down -- it's like going down with a hose
2   down into this pipe and you -- pipe, either water or gas, and you
3   can jet out.  If there's some sand there, if there's some debris
4   there, you jet that out and off you go.
5       You're also going to hear evidence that some of these wells
6   if -- that -- you may hear him complain about some other wells,
7   that it could come on better than the well was producing when we
8   impacted it, because if we're breaking up the rock to help our
9   well, it's breaking up the rock in the vicinity of his well too,
10  to help his well.
11      In any event, his own testing company is going to tell you
12  that when they went back out there in November of 2016, it wasn't
13  to try to repair the well, it was just to take some water
14  samples.
15      We also have a counterclaim.  We say that the contract has
16  been breached by Singer, that the contract clearly provides -- it
17  was -- it was to avoid this very situation, it was to say, hey,
18  if we impact one of -- your well -- you know, whether you consent
19  to it or not, if we impact it, we want to pay.  We'll hire a
20  third-party engineer, we'll try to agree good faith -- you're
21  going to see we made some good faith overtures to him shortly
22  after he made a claim that were rejected.  We offered to give him
23  a replacement well.  And that's the thing, just like if someone
24  totals a 1977 car you own, you go out and find a replacement car,
25  you can find a replacement well.  You're not going to pay

1  $600,000 for it, you're probably going to pay the 60,000 or price
2  range that he paid for the well, to a hundred thousand.
3      In any event, the other thing is that we had another case
4  that we just settled with him before he made this claim, and it
5  was a confidential settlement agreement.  And we have a
6  counterclaim for him violating that settlement agreement and
7  disclosing that, and you're going to hear the evidence on that.
8      So at the end of the evidence, we're going to ask that you
9  find that if we have impacted his well, only give him what -- the
10 cost to repair it, which we're willing to pay, or no more than
11 the value of the well.
12     Thank you, Your Honor.
13         THE COURT:  Thank you.
14             (Conclusion of requested transcript.)
15
16
17
18
19
20
21
22
23
24
25

REPORTER'S CERTIFICATION

       I, Emily Eakle, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of Oklahoma, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

       Dated this 12th day of November, 2017.


**/S/ Emily Eakle**
EMILY EAKLE, RMR, CRR
Federal Official Court Reporter